UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    -v-

PAUL D. SKINNER and
SYLVESTRE ACOSTA,

                Defendants.

**AFFIDAVIT**

**08-CV-864A**
**03-CR-11A**

_____

STATE OF NEW YORK   )
COUNTY OF ERIE      )   SS:
CITY OF BUFFALO     )

    ANDRES S. ORTIZ, being duly sworn, does depose and state:

    1.    Deponent makes this affidavit in the above-captioned proceeding, with the understanding that it will be considered by the District Court in deciding upon the motion brought by Defendant Sylvestre Acosta pursuant to 28 U.S.C. §2255, which seeks to vacate and set aside the judgment of conviction against Mr. Acosta.

    2.    Deponent was employed by the City of Buffalo Police Department from 1980 to the year 2006. In 2006, deponent pleaded guilty to an innocuous misdemeanor, specifically, violation of 18 U.S.C. §1030(a)(2)(B), which prohibits unauthorized use of a computer. Quoting from the plea agreement, the factual predicate for this conviction was ". . . on or about June 28, 2004 the defendant accessed a Buffalo Police Department Computer in a manner which exceeded the scope of his authorized access and obtained personal history information for another person maintained by the NCIC system of the United States Department of Justice. The defendant then passed this information along to Franklin Johnson." The sentence was a $2,500 fine.

    3.    Other than this transgression, deponent has no criminal record whatever.

4.      Deponent retired from the Buffalo Police Department in 2006, and obtained a license as a Private Investigator from the State of New York, and has maintained said license in good standing since then.

5.      Deponent has no interest in the outcome of this proceeding.

6.      Deponent was hired by Mr. Acosta's counsel, David J. Seeger, Esq., in or about October, 2008 for the purpose of conducting an investigation.

7.      Deponent ascertained the whereabouts of one Gerald Skinner and contacted him by telephone to determine whether Mr. Skinner had information of possible relevance to the Acosta conviction.

8.      Mr. Skinner told deponent that he had just cleaned out his mother's attic because a new roof was being installed, that he came across a bag of audiotapes that he had made many years before, that "Cody" (who deponent understands to be Roland Adside, a star witness for the Government at the trial of Mr. Acosta), and that on one of the tapes Cody was talking about the search warrant for 395 W. Delavan.

9.      This information caught deponent's immediate attention because deponent had reviewed the trial testimony against Mr. Acosta and was aware of the fact that Mr. Acosta was convicted for having participated in an unlawful search of the 395 W. Delavan premises, based on a warrant that falsely attributed to confidential informant Cody (Roland Adside) the supporting information.

10.     Deponent then met with Mr. Skinner.  Mr. Skinner vouched for the authenticity of the audiotapes as having been made in the course of his employment as a Buffalo Police Department Officer in the late 1990s.  Deponent recognizes Mr. Skinner's and Rene Gil's voices.

11.     Also, as the annexed transcript of the Rene Gil interview shows, Mr. Gil recalls that Mr. Skinner recorded information on a hand held recorder.  (Mr. Gil was Mr. Skinner's partner in the late 1990s when they were assigned to the Narcotics unit).

12. The annexed Gil statement further confirms the accuracy of the tapes, particularly as to Cody's information used to obtain the 395 W. Delavan search warrant.

13. Deponent decided to locate the Government's other chief witness, Rene Gil. Deponent respectfully draws this Court's attention to certain circumstances of Mr. Acosta's conviction.

14. The redacted Second Superseding Indictment, dated October 30, 2003, presents seven counts against Mr. Acosta. Deponent understands the first count is a non-felony.

15. Counts two and three, on the other hand, are felony counts that pertain to the search of 120 Potomac (Count Two) and 395 W. Delavan (Count Three). These two counts each accuse Mr. Acosta of, among other things, "participating in the execution of a search warrant knowing that such warrant had been obtained through the presentation of false information to a judicial officer. . ."

16. It is further deponent's understanding that Defendant Acosta, in Count Five of the redacted Second Superseding Indictment, was accused of conspiring with others to deprive various persons of their Constitutional rights, including "the right to be free from unreasonable searches and seizures."

17. It is of particular importance that Mr. Acosta was convicted of three 18 U.S.C. §924(c) counts, one associated with the search of 120 Potomac, another with the search of 395 W. Delavan and the third with the conspiracy (Count Five).

18. Because of the mandatory minimum sentences applicable to Mr. Acosta associated with the §924(c) counts, Mr. Acosta was sentenced to 45 years and one day's imprisonment.

19. Therefore, as deponent understands the circumstances, if the Court were to vacate the conviction on Count Two, pertaining to 120 Potomac, the §924(c) conviction associated with that would also be vacated, and with that a 20 year minimum term of imprisonment. Likewise, if this Court were to vacate Mr. Acosta's conviction on Count Three,

pertaining to the 395 W. Delavan address, the associated §924(c) count would likewise be vacated and so would the 20 year minimum term of imprisonment imposed on that conviction.

20. So, as deponent understands it, the validity of the 120 Potomac and 395 W. Delavan addresses bears on Mr. Acosta's convictions on Counts Two, Three, Six and Seven of the redacted Second Superseding Indictment dated October 30, 2003, and therefore roughly 40 years of the 45 year and one day term of imprisonment to which Mr. Acosta is sentenced.

21. When deponent interviewed Mr. Skinner, learned that the audiotapes from 1997 and 1998 were in existence, that they revealed Cody to be an active informant working with Mr. Skinner, and that Cody was indeed heavily involved in providing information pertinent to the search warrant for 395 W. Delavan, deponent decided to attempt to locate Mr. Rene Gil.

22. This is because, at trial, Mr. Gil testified that the search warrant of 120 Potomac was wrongfully obtained, i.e., that it falsely attributed the information leading to the 120 Potomac warrant to Cody.

23. Deponent managed to locate Rene Gil in the State of Florida, that is, 3611 SW 34th Street, Apt. 146, Gainesville, FL.

24. Deponent appeared at Mr. Gil's doorstep on November 20, 2008. Deponent identified himself as conducting an investigation on behalf of Mr. Acosta.

25. Deponent and Mr. Gil were fellow officers of the Buffalo Police Department and therefore knew each other personally.

26. Mr. Gil agreed to be interviewed and asked deponent to return the following day at 5:00 p.m. to Mr. Gil's apartment to conduct the interview.

27. Deponent, on November 21, 2008 met with Mr. Gil, interviewed him, and made an audiotape of the interview.

28. Deponent has retained the original audiotape and is willing to testify as to its authenticity.

29. Deponent later transcribed the audiotape. A copy of the transcript of the November 21, 2008 interview of Mr. Gil is annexed hereto as Exhibit A.

30. Deponent respectfully draws this Court's attention to several aspects of the Gil statement.

31. First, in his trial testimony, Gil testifies that deponent, in the 1997 to 1998 timeframe, when various illegal searches and thefts were to have occurred, was assigned to the Narcotics Unit and therefore working with Mr. Gil, Mr. Gerald Skinner, Mr. Paul Skinner, and Mr. Acosta.

32. One reading that testimony of Mr. Gil might reach the conclusion that deponent was connected with the activities which led to the convictions of Rene Gil, Gerald Skinner, Paul Skinner and Mr. Acosta.

33. However, in the early 1990s, deponent was reassigned from the "SNAP" unit to Precinct 12 on Genesee Street near Fillmore Avenue. Deponent worked there as a Detective, on days, for approximately 11 months, and was then reassigned to the Homicide Squad, where deponent worked for approximately 13 years, until his retirement in 2006.

34. So while the events which formed the basis of the indictment were unfolding, deponent did not work with Narcotics at all and, for that matter, Rene Gil, Paul Skinner, Gerald Skinner and Mr. Acosta.

35. When deponent interviewed and audiotaped Mr. Gil, deponent made it very clear that he was tape recording the interview, and that Mr. Gil should expect to testify at a hearing in the District Court in Buffalo as to the statement Mr. Gil was giving. Likewise, deponent impressed on Mr. Gil the importance of being truthful.

36. The Court's attention is respectfully drawn to the following points.

### *120 Potomac*

37. At trial, Mr. Gil testified that he lied on the search warrant application for 120 Potomac, in that he falsely attributed the source of the information to Cody, and that he lied to

take "a short cut."  A copy of this testimony from Mr. Gil is annexed hereto as Exhibit B, which are pages A-738 and A-739 of the *USA v. Acosta* joint appendix on appeal.

      38.      However, Mr. Gil's interview states the opposite:

> Q:      I'm going to ask you specifically about 120 Potomac. Did Sly have direct knowledge when that search warrant was being executed?  That there may have been a short cut done to get that search warrant?
>
> A:      On that one there was no short cut done.  We used an informant on that one.  But if he wouldn't have no knowledge.

      39.      After audiotaping the statement of Gil, deponent talked with him concerning what Gil recalled.  The subject of the 120 Potomac search warrant came up, and Mr. Gil made it clear to deponent that he knew and remembered the address, and that the search warrant was "good," and that his testimony at trial on this point was incorrect.

      40.      Again, as to 120 Potomac, Mr. Gil stated the following:

> Q:      Was the purpose for the search warrant, I am going to ask you this three times because I'm going to start with 120 Potomac, it was applied for and executed; was it done purposely, was the purpose to withhold possessions from their rightful owners?  Do you understand what I am saying, was it in the course of your regular job and hope of fighting crime and possibly getting drugs and a drug dealer off the streets or were you there to remove people's property to maintain it for yourself?
>
> A:      It was actually done to try and get drugs off the street.

### *395 W. Delavan*

      41.      The following is what Mr. Gil stated to deponent respecting this address:

> Q:      I am going to ask you the same question in regards to 395 W. Delavan that search warrant application I'm not sure if it was yourself or if 395 was Det. Skinner.  521 Walden I'm not sure which detective obtained that search warrant.  Again, when that search warrant as being executed along with the SWAT team and God knows whoever else was there would Sly have any direct knowledge when being executed that it could have been a bad search warrant?

        A:     No he wouldn't have no knowledge of that.

42.    Soon after, Mr. Gil stated the following:

        Q:     The same question for 395 W. Delavan. In executing that search warrant, was there pre-planning what may have been in the house, what was going to be removed from the house and what was going to happen once it was removed?

        A:     Again the thing was to get as much drugs and guns off the street as possible.

        Q:     So the search warrants were basically done to do your job and at some point there came a situation or occurrence that things were removed incidental to the real purpose of the search warrant.

        A:     Correct.

        Q:     With no planning with the people executing the search warrant?

        A:     Correct.

43.    Elsewhere in the interview, Mr. Gil, after listening to the audiotape that deponent obtained from Mr. Skinner respecting informant Cody's information about 395 W. Delavan, stated that he could not remember the source of the information for that search warrant, that it may have been Cody, and that the information from a certain Johnny Reed concerning "Bebe" and an address on W. Delavan may or may not have been the basis for the 395 W. Delavan search warrant.

44.    It should be noted that the Gerald Skinner audiotapes include statements by Mr. Skinner identifying 395 W. Delavan by name and describing the building in detail, as is customary for search warrant applications. Audible in the background is the voice of Mr. Rene Gil and, also, another person who deponent understands to be informant Cody. Also audible is the police radio transmissions.

45.    What this means is that Mr. Gil has no plausible basis to conclude that the 395 W. Delavan search warrant was anything else but legitimate.

/s/Andres S. Ortiz<br>ANDRES S. ORTIZ

Sworn to before me this
23rd day of September 2009

/s/Leigh E. Anderson, Esq.
LEIGH E. ANDERSON, ESQ.
Notary Public
State of New York
Qualified in Erie County
My Commission Expires 11/4/09