# EXHIBIT A

Rene Gil Interview Gainesville Florida

11-21-08 1700hrs. Investigator Andres Ortiz Par Investigation interview of Rene Gil

3611 southwest 34th St. apt 146 Gainesville Florida Andy Ortiz Par inv. Representing Sylvester Acosta arrest trial date 12-06-04 I'm her with Rene Gil testified in regards to this.

Q. Rene Gil state your name address and spelling please.

A. Rene last name spelling Gil pronounced Gil.

Q. Date of birth please.

A. 5-3-58

Q. You were arrested on 5-1 for conspiracy to traffic in narcotics.

A. actually 5-8 of 2001.

Q. You testified in front of a grand jury 11-17-02.

A. yes.

Q. In agreement for your plea, you had to testify in the trial of Sylvester Acosta and Paul Skinner.

A. Yes I did.

Q. If you can if you can recall I understand it is 10 years later, your assignment of the Maryland street detail until the time of your arrest.

A. It the Maryland street detail ,after a while it got changed over tot the street crime unit, then a short time later it got to the name of the unit got changed to SNAP the streets narcotic attack program.

Q. From there where did you go?

A. From there after snap was dissolved we got absorbed into the narcotics division.

Q. On of the people was Andy Ortiz.

A. Yes.

Q. Can you recall if he was assigned to the unit?

A. I believe we were the street crime unit.

Q. Was he a patrolman or acting detective?

A. I believe he might have been an Acting Detective at the time.

Q. Do you recall this better today?

A. Ya.

Q. When you testified you testified that he was in the Maryland street detail in uniform.

A. Yes.

Q. But today you know better than that.

A. Yes.

Q. Did the BPD sanction what the Maryland St. detail was doing?

A. Yes.

Q. was the unit recognized for the curtailing of gang and drug dealing related shootings while the inception of Maryland St. detail street crime unit.

A. Yes. They were.

Q. Did the BPD along with the district attorney aware of the ongoing thing, Maryland street detail snap unit.

A. Yes.

Q. Where you ever brought in and question about the activities of the Maryland street detail snap unit street crime unit were involved in.

A. After my arrest.

Q. Prior to that everything was ok.

A. Yes.

Q. Can you recall what would routinely happen with the drug and gun arrest made by the unit, with the district attorney's office at arraignment?

A. I'm sorry I los you.

Q. When these arrest were made by the Maryland  detail snap unit street crime unit, routinely they would go to court the next day in the arraignment,  could you recall what would happen at most of the arraignments.

A. Well they would either plea bargain the charges down or sent for preliminary for probable cause for the grand jury.

Q. Several of those arrest was it rue in fact that the people would take pleas to disorderly conduct because of the way they were arrested.

A. Yes.

Q. That was Ok by the district attorney and the Buffalo Police Department.

A. At the time yes.

Q. When did it change, that it was no longer routine for the department.

A. I believe it was due to the exuberant amount of arrest that were being made we were told to actually to curtail our amount of arrest we were producing daily.

Q. The procedure of search warrants when did that come into effect.

A. It wasn't

Q. If you recall. In the Maryland detail did you execute many search warrants?

A. Maybe 1 or 2.

Q. That was because of on going investigations were something that just happened.

A. There were ongoing investigations.

Q. Something you came across and further proceeded with.

A. Yes.

Q.   In the Maryland Detail were you assigned to the same guy's that you originally stated, Jerry Skinner, Sylvester Acosta, Andy Ortiz lets exclude Andy Ortiz from the Maryland Street detail if you recall the names.

A. It was Dicky Dole, Andy Streicher , Eddie Cotter, Timmy McDonald, myself, ray Cullinan, there were a couple of other people.

Q. Under the direction of Lt. McCarthy.

A. Yes.

Q. Can you recall if possible how many search warrants were done and if anything strange was done on the search warrants while you were assigned to the Maryland detail?

A. Can't recall at this time the amount and while we were in the Maryland St Detail there was nothing wrongfully done on those search warrants.

Q. As far as a person riding by themselves in your memory can you recall this ever happening.

A. No. As far as the Maryland St detail street crime unit. No because of Officer Safety we were dealing with bonified gang members on the lower west side they would carry guns confront the police on several occasions and we were told not to ride by our selves.

I'm going to stop the tape to see how the recording is going.

Q. Did there come a time when the snap unit the people on the Westside decided to carry the drugs purchased in their mouth incase they got accosted or stopped by the snap unit street crime unit Maryland detail that they would swallow it.

A. Yes.

Q. in leu of that was it common practice would some people grab the people by the throat and half choke them to make them regurgitate what they swallowed

A. yes

Q. was there somebody there that would rather than go thru that process happen to have a bag and at would be the person who swallowed the drugs and it would belong to them at that point.

A. Yes.

Q. Maryland and west I am going to describe an incident that took place can you recall if the people in question were arrested and what for, specifically addressing the issue as making a stop and you searched an area and Andy Ortiz searched an area shortly afterward and Andy found a bag of drugs and is basically and issue of planting drugs. Can you at this time tell me if the people were arrested when that situation took place?

A. Yes they were

Q. Can you tell me what if anything happened to the people when they were arraigned in the morning?

A. no no I can't recall.

Q. Would it be common practice basically when you would go to court in situations such as this that the judge would basically give everybody a disorderly conduct and tell them to please leave the court?

A. Yes

Q. The arrest that were made and the stops that were made by the Maryland detail snap unit street crime unit were they in fact for the purpose of finding information and getting ideas of who the people are because we didn't we knew them as to who they were and didn't have positive identification so, what I'm trying to say that we were gathering intelligence and we did put them with something and overlook it a favor would be owed to us, was this a common practice by the units that you were assigned to.

A. Yes

Q. In fact in the conversation today with Andy are you now aware that he wasn't assigned there until probably 6-months after the inception of the unit actually was when you all were you were made acting detective 2-months prior to him getting there.

A. Yes.

Q. So in lieu of that you were testifying that Andy was there in the Maryland detail is that correct at this point.

A. Yes.

Q. You testified as to the remark by Sly that some times we got to do what we got to do, that statement by Sly was that in a positive way or basically trying to brush it off like he basically did all of the time.

A. Just trying to brush it off.

Q. Would Sly address and issue like that and make waves and put somebody on the carpet for something like that.

A. No.

Q. In regards to the stops corner stops frisk and searches  the vehicle stops to gain intelligence in fact is that a procedure that Lt. McCarthy was aware that they unit was trying to do investigations  rather than hit the corners and continue what the Maryland detail inception was for.

A. Yes.

Q. if you can recall did he several times. He was pretty aliment about it.

A. Yes he was.

Q. wasn't our unit sole purpose to be a show for the residents for the predictability of the drug dealers and the shooters and create statistics that were bewildering to every other agency.

A. Yes.

Q. In fact we did do that.

A. Yes we did.

Q. In fact when the unit was disbanded the if you know the shootings and the guns situation got quit a bit worse.

A. Yes.

Q. The stats of the unit were they recognized along with the community leaders and applauding them for all the arrest that what was basically were guided to and asked to do.

A. Yes.

Q. In fact were a lot of the pat downs vehicle stops and searches in response to direct complaints by the residents.

A. Yes

Q. Could you give what you believe to be a decent percentage of activity in regards to the stop and frisk searches the vehicle stops surveillance on homes that were in direct response to complaints.

A. 95 %

Q. There was an incident where Andy took money from a school kid during school time if you can recall.

A. I can't recall.

Q. If this in fact happened during school time would anyone from the unit be assigned during school hours when children are supposed to be in school?

A. Ya.

Q. There was an incident at the red carpet inn that was brought up where a young man at the hotel and Pauly knocked on the door pushed you in there was a       taken place and the guy was placed under arrest and there was a gun recovered specifically a 357 magnum that was under the pillow do you recall that incident that you possibly the incident that you mistakenly testified to as a drug dealing incident. In fact is there an incident that Lt. McCarthy called the unit in where a young lady was beat up pretty badly because her boyfriend was having sex with her and when he withdrew form her and there was a blue rubber on the end of his penis and Lt. McCarthy called us in because a friend of his called him and it was his daughter in fact we responded to that.

A. Yes we did.

Q. Are the circumstances regarding that situation and what you described as a drug dealing incident some what similar.

A. Yes.

Q. Today when the snap unit turned into the narcotics unit you realize now that Andy sort of got detailed to pct. 12 on days during that period.

A. Yes he did.

Q. Regarding manitol cut was this part of planting drugs or just a random sort of thing that happened.

A. Random sort of thing that happened.

Q. Training for the guys from narcotics as far as the snap guys when they were received in narcotics was that done by anybody.

A. That was done by narcotics Lt.

Q. How were the snap guys received when they got transferred back to narcotics?

A. There was no welcoming with open arms.

Q. In fact when you were made acting detective is it true that some of the patrolman assigned to narcotics got reassigned because there were only so many acting detective badges that could be given out.

A. Yes

Q. Did that possibly create some dissention between the snap guy's that got placed there and the guy's that were there?

A. Yes it did.

Q. As far as partners in the Maryland detail, there as you and Ray Cullinan.

A. Yes

Q. And the SNAP unit it was you and Ray Cullinan.

A. Yes.

Q. Narcotics it was you and Ray.

A. Yes.

Q. Until Ray's retirement if you can recall.

A. Yes.

Q. Specifically about the 521 Walden search warrant do you recall that?

A. Yes.

Q. Do you recall the name of the person possibly?

A. I'm thinking a black male by the name of Johnny Reid.

Q. That 521 Walden there was a search warrant executed with the swat team do you recall that.

A. Yes.

Q. That search warrant was gotten by Jerry Skinner. Do you recall if Jerry Skinner got that search warrant?

A. I can't recall at this time exactly who got it but I know there was signed search warrant.

Q. Is it possible considering that the swat team was involved that Jerry actually did'this search warrant Jerry would have dotted all the I's and crossed all the t's.

A. It is possibly that Jerry would have got it.

Q. When executing the search warrant did you know what would be in the house.

A. No.

Q. On any search warrants were you ever sure of what would be in the house.

A. We weren't privy what was in the house we got the search warrant based on trying to retrieve illegal drugs from locations

Q. In executing the search warrant on Walden were you ever aware that a safe was retrieved from that location.

A. No safe.

Q. So you're not aware that a safe was retrieved from that bedroom and brought into the kitchen where Johnny Reid was and cracked open.

A. No safe

Q. You have no knowledge of a safe.

A. No knowledge of a safe.

Q. Do you have any knowledge of money taken from 521 Walden?

A. I can't recall at this time if there were any money taken or not.

Q. If I tell you that there was 20,000.00 that was allegedly taken from the safe.

A. That that was not true.

Q. So from 521 Walden you never ever received a dime or any proceeds from 521 Walden.

A. I can't recall if I received anything from that search warrant I just know it was no 20,000.00 in that house.

Q. You're specifically aware of that.

A. oh yah

Q. when u execute the search warrant you would do it with a group of people did at anytime before the search warrant during the search warrant have a plan as to possibly removing items with the intent of taking them from the proper owner.

A. No.

Q. All of this with you testifying along with the swat team a Lt. being there probably two of them because I believe the commander of the swat team is a Lt. and who knows who else would it be reasonable to believe that the search warrant wasn't executed properly and was a good search warrant at it's face value.

A. un audible answer

Q. Would you say that removing items from a search warrant Walden basically, a situation of circumstances on any search warrant something was taken, was it taken with a preplanned issue and a preplanned disposal?

A. No.

Q. So basically it was just a matter of coincidence that there may have been something there that was removed.

A. Yes.

Q. Not saying that there was something removed from 521 Walden but circumstances with search warrants as a total.

A. as a total yes.

Q. At issue of clothing description now is some of the testimony within the trial somebody stated that people would where hoody and hat baseball is this relatively consistent to say that possibly everybody within that unit wore that type of clothing.

A. 98 % of the people up in narcotics squad basically wore the same type of clothing.

Q. Is that because the elements were quite frigid.

A. Yes.

Q. It wasn't to hide identity was it?

A. No.

Q. were still maintaining 521 Walden the gentlemen named Johnny Reid was arrested and agreed to cooperate and at some point he mentioned Bebe in his testimony that he gave that information that he would give you Bebe, do you remember that.

A. yes.

Q. Do you recall whether he knew who bebe was?

A. At the time he didn't know Bebe's real name, he said he was going to get the information and pass it on to jerry Skinner. Jerry was his control officer.

Q. Did a time when you found out bebe was Victor Miller from 395 W. Delavan.

A. Yes.

Q.  395 W. Delavan in listening to the audio tape now are you somewhat aware that the normal procedure for search warrants was utilized as far as description of the building and the address which would be normal for what purpose.

A. To obtain a search warrant.

Q. On that tape did you hear the voice of the person utilized for the purpose for the search warrant?

A. Yes.

Q.  What was the voice that you heard?

A. It was an informant that Jerry has used to use  a lot by the name of Cody, don't know his real name know him as Cody.

Q. You can recognize the voice on the tape that I have played for you.

A. Yes. Didn't know the tape existed but yes.

Q.  At this time you stand corrected that possibly unbeknown to you that Jerry Skinner utilized Cody for the search warrant for 395 W. Delavan. It's a very good possibility that he did this unbeknown with out any knowledge on your behalf.

A. Yes.

Q. It is uncommon for one officer to take someone to get a search warrant.

A. No.

Q. It's not abnormal for one officer to take this guy to the judge or take a certified copy of an informant present it to the judge and get it signed.

A. Cody was a certified informant ok he was a registered informant so all Jerry basically needed to do, was approve the search warrant on his say so.

Q. In listening to this audio tape was this a common practice by everybody within the unit to utilize audio tape to describe buildings.

A. it was jerry's unique way to cya you know what cya means.

I think we all know that.

Q. Were you there when Cody went into the house 16 center Lane specifically which is a upstairs apartment and went there for Jerry skinner for the purpose to make a buy along with you, I'm not sure you were there I would assume Jerry was there with a partner. Were you aware that Cody came back and told Jerry the guy wouldn't sell to him but he sold an 8 ball to the guy in front of him? And asked the guy assuming that Cody was with this guy and asked the guy that bought the 8-ball if Cody was in fact with him and the guy said he didn't know him and the guy at 16 Center lane wouldn't sell to Cody.

Q. I remember going with the informant to 16 center lane Jerry and I taking the informant and dropping him off the informant came back and told us that the guy wouldn't sell to him but he did see a transaction take place the particulars about it I can't recall but I do remember going up there with Jerry and Cody.

Q. Again I'm going to ask you about 16 Center lane and you executed a search warrant there, did you know what was in the apartment before you went in there.

A. No.

Q. It is common knowledge that you don't really you're not sure what's in the apartment before you execute the search warrant.

A. That's common knowledge.

Q. So in lieu of that the monies that was in the apartment at 16 center lane there was no preplanning no awareness that there was going to be anything there that could be taken.

A. Correct.

Q. In fact that you indicated to me that you utilized a shortcut on that search warrant which basically you put in there didn't know what to expect in there, and in the search warrant you have, if you can to the best of your recollection tell me what took place at 16 Center Lane that day.

A. Well we had the search warrant signed what we did we went and set up surveillance at the place we observed a male a female and a child approach in believe some type of suv they were going to go in the house we detained them called for the rest of the people come help us execute the search warrant. The suspect wife began crying saying it was cold it was cold at the time said the baby she kept on saying my daughter u know my kids I couldn't tell if it was a girl or boy she kept on saying it was cold and the baby was cold so we decided to enter the premises without the LT being present.

Q. At some point you called for the Lt.

A. Yes I did.

Q. At that point did you already search the apartment?

A. Yes we did.

Q. So for all intensive purpose the search warrant was executed and done but you basically called the lt. because of departmental procedure.

A. Yes and we got in trouble behind it; I got suspended 5 days for it.

Q. So even though you tried cover your CYA you still got suspended 5 days for it.

A. Yes.

Q. When the Lt arrived along with the other officers again I'm going to reiterate for all intensive purposes the search warrant was completed before they arrived there.

A. Ya

Q. Was there anything retrieved there.

A. There was if I'm not mistaken there was no drugs some money found and that was it.

Q.   This money found before you went in there you believed there was money there.

A.   N.

Q.   After the money was found did you, what did you do with the money after the money was found.

A.   We actually took the money.

Q.   You took the money and at some point the money was given out to other people.

A.   Yes.

Q.   When this money was given out to other people it was explicitly state where the money came from.

A.   It wasn't explicitly stated where the money came from, it was assumed.

That could be understood.


Q.   When the money was given to anybody was it stated that this is from 16 Center Lane.

A.   No.

Q.   So the person technically wouldn't know where the money came from.

A.   The person wasn't told where the money came from.

Q.   That evening you met Sly at the Buffalo House was that basically routine.

A.   oh Yea

Q.   Every time you met Sly at the Buffalo house there was no underlying element in regards to meeting Sly at the Buffalo House.

A.   No.

Q.   The evening of 16 Center Lane chances are you would have went to the Buffalo House anyway.

A.   Yeah.

Q.   That's where Sly received the money at the Buffalo House.

A.   Yeah

Q.   When Sly received the money did he count the money did he take the money did he ask you where it came from.

A.   He didn't ask no questions.

Q.   What did he do with it?

A.   He put it in his pocket.

Q.   He had no idea how much was there.

A.   Had no idea.

Q.   Go to 120 Potomac upon entry Jerry Skinner was the entry guy, evidently there was a shot fired where a dog was killed.

A.   Dog was disposed of.

Q.   That's the purpose for discharging of the shotgun.

A.   Yes.


Q.   Was Jerry using the shotgun in any kind of way was he pointing it at somebody to scare him coerce him.

A.   Well usually upon entry you don't know if the person has a gun or not people we are trained to level the gun at people and request to get down on the floor that's a common practice and everybody's trained that way.

It's a safety issue more so than any other issue.

Q. Were you or anybody aware what was in the house at 120 Potomac?

A. We got this search warrant on the pretense that there were possibly drugs that's all.

Q. Before entering the house you had no information regarding any kind computer equipment or anything such as that.

A. No.

Q. There was no plan to remove any computer equipment fro the house.

A. No

Q. You stated that you assisted Sly in placing the computer equipment in his vehicle police vehicle personal vehicle do you recall which vehicle.

A. Can't recall.

Q. Do you know what happened to that computer equipment?

A. No

Q. Could Sly have P-10 d that property at another time unbeknown to you?

A. he could have.

Q. Did Sly ask you for money from any of these, 120 Potomac 395 W. Delavan, 521 Walden?

A. Again as I stated before nobody asked it was given.

Q. Was Sly even aware that money was taken at these places?

A. I don't know.

Q. We can presume that money came fro 120 Potomac but was that something that was said or implied something here and never addressed where it came from how much it was or anything like that.

A. Nothing like that.

Q. 395 W. Delavan Victor Miller later reviewing that audio tape is it possible that you and Cody were mistaken then, that there wasn't a legitimate search warrant.

A. The way the search warrant was obtained on its face was legitimate I don't recall if you remember when we talked about shortcuts, but when we talked about short cuts that was a shortcut.

Q. In lieu of the Jerry identifying the tape with you in the vehicle identifying the house and Cody being in the vehicle at the same time, and Cody did go to the house and try to make a buy.

A. Yes

Q. So in lieu of that do you recall Cody actually made a buy there?

A. I can't recall.

Q. You can't recall but Cody could have made a buy or could have said there were drugs or something in the house and that would give Jerry reasonable cause to make an application for a search warrant.

A. Yes.

Q. In regards to 395 W. Delavan you previously said that Reid assisted in the information at 395 W. Delavan correct.

A. Ya

Q. Because he mentioned Bebe.

A. He mentioned Bebe; he did mention an address on W. Delavan that he was going to work on.

Q. But he didn't know who Victor Miller was. He never gave you the name Victor Miller.

A. He never gave me the name Victor Miller, he might have given it to jerry, I don't't know.

Q. But you had no knowledge as far as him having any idea of who Victor Miller was.

A. Correct.

Q.  Other than him possibly being Bebe.

A.  Correct.

Q.  The operational plan that is made out in the search warrant is that a plan that you make out in basic form that fairly frequently isn't consistent with what takes place at the search warrant.

A.  Yes.

Q.  Why is that?

A.  Every search warrant is unique things could happen at the spur of the moment that will make the officer deviate from that plan.

Q.  OK That's basically as I recall a specific incident where somebody got stuck in traffic and wasn't able to be there to perform their function and basically somebody just stepped up and took the place.

A.  Yes.

Q.  And they would basically make the operation plan obsolete then.

A.  Null and void.

Q.  It was in good intentions right.

A.  Yes.

Q.  So in your testimony isn't it true even though you along with other officer you were armed and Victor Miller was relieved that it was the Police that entered his house.

A.  He thanked us.

Q.  Why did he do that?

A.  Because he thought that people were going to I don't know actually break into the house and kill him and his whoever was there to rob him.

Q.  And that was because of if you know Victor Miller was a victim of that previously.

A.  I can't recall.

Q.  So in reality the weapons that were worn by the officers along with the shotgun that the officer had Victor Miller didn't show any intimidation or fear from it.

A.  He was when we entered said oh Thank god it was the police.

Q.  Jerry stated make sure you take care of Sly and the share of the money and gave you what was proceeds from the money from 395 W. Delavan. Do you recall that?

A.  Ya.

Q. Did Jerry say the money specifically is a share for Sly or was it just here and.

A.  He just said give this to Sly.

Q.  Later that evening in giving the money to Sly did he ask how much it was where it was did he inquire anything about the money.

A.  No.

Q.  Did Sly ask for a cut?

A.  No.

Q.  In regards to Jamaicans this was addressed was it Maryland detail street crime unit narcotics if you can recall.

A.  I mean I can't recall exactly when

It was a while ago it's understandable.  Rene how long 10 years me yes sir.

Q.  Cody browns got payment in regards to some of these search warrants can you recall that.

A.  I can recall some of them ya.

Q. Specifically Cody brown 395 W. Delavan there is paperwork saying he got a thousand dollars for executing that search warrant, do you recall that payment.

A. I recall him getting paid for the exact amount no not off of the top of my head.

Q. Cody Brown testified that he was make out them forms for payment request there was an issue of his signature, did you observe him sign them all the time, by any chance were they signed before hand by somebody because of the possible inconvenience of catching the Lt. for the payment and catching Cody brown.

A. That particular one like I was saying Jerry was his control officer so I mean I don't to much about it. All I know is that a lot of times guys would take short cuts you would have to locate the Lt. inconveniencing people it was hectic so.

Q. You know today that Cody Brown was a certified informant.

A. Yes.

Q. You knew that previous to the search warrant applications that Cody was certified.

A. Yes.

Q. If I tell you today that Cody testified in front of the judge 4-6 times it would certify him as a informant.

A. Yes.

Q. So in lieu of that him being certified basically if he went on your request to make a buy and he came back and stated that he bought at such and such residence and you would apply for a search warrant up on that information.

A. Yes.

Q. Who bought 3-4 times and felt comfortable t is the trust element with search warrants I mean wit confidential informants?

A. You try to make buys with 3-4 times you would ask him questions and once he bought 2-3 times or 3-4 times and you felt comfortable with the accuracy with the information he gave you then you would take him at his word that he observed drugs at place that he had bought at a place. You would actually have to eyeball him the informant make sure he went to the right location and a lot of time s I would take an informant and he didn't go to the right place and you would have to reword the search warrant all over again.

Q. What about the issue that standard procedure to search pat down an informant before and after a sale was conducted.

A. That's standard you have to search him to make sure he doesn't have any drugs on him make sure he's not trying to lie even though you got the trust you have to do your job.

Q. I regards to search warrants Sly isn't on any of those search warrants is he.

A. no he's not. Not that I can recall.

Q. Do you know if Sly has knowledge that the search warrants were bad search warrants that short cuts were taken, do you know if Sly has direct knowledge of that?

A. I don't have the faintest clue.

Q. So prior to these search warrants being executed 395 w. Delavan 120 Potomac 521 Walden at this time right now you don't know whether Sly had direct knowledge the application of them search warrants.

A. No I don't know can't recall if he had direct knowledge or not in fact. If he would have been the one applying for the search warrants I could see him having knowledge of what was going on. The search warrants were being applied total different officer.

Q. You know that if det. Sodlacha applied for a search warrant would you have knowledge of the search warrant application process he went thru.

A. No.

Q. So as common practice and understanding if an officer had a search warrant it was a legitimate search warrant you would go an execute it and do the paperwork everything and go on to the next search warrant.

Q. So when you execute these search warrants that potentially could be bad search warrants doesn't know the other officers there are 5 6 7 officers assigned to them.

A. Yes.

Q. So basically when u do these search warrants you just have to have faith that these search warrants are being done appropriately and under proper rules and regulations of New York State.

A. Yes.

Q. In that idea Sly technically wouldn't have direct knowledge of the process application and whether it was done underhandedly or done properly.

A. He wouldn't have no knowledge if what Jerry or I was up to

Q. I'm going to ask you specifically about 120 Potomac did Sly have direct knowledge when that search warrant was being executed that there may have been a short cut done to get that search warrant.

A. On that one there was no short cut done. We used an informant on that one. But if he wouldn't have no knowledge.

Q. Let 's go with 521 Walden Ave the search warrant that was gotten by Jerrry Skinner with Cody as the informant would Sly have any direct knowledge when that search warrant was being executed that there was some inappropriate activity in regards to the application of that search warrant.

A. He wouldn't of had no knowledge.

Q. I am going to ask you the same question in regards to 395 W. Delavan that search warrant application I'm not sure if it was yourself or actually 395 was Det. Skinner 521 Walden I'm not sure which detective obtained that search Warrant again when that search warrant was being executed along with the swat team and god knows whoever else was there would Sly have any direct knowledge when being executed that it could have been a bad search warrant.

A. No he wouldn't have no knowledge of that.

Q. What items were removed from the premises where the search warrants were executed was there any preplanning or agreement on what would be taken how it would be given who would take what specifically computer equipment.

A. No.

Q. Prior to going into these houses it was unknown by all the people that went to do the search warrant what may be in the house.

A. Including the people who applied for the search warrant. Correct

Q. Was the purpose for the search warrant I am going to ask you this three times because I'm going to start with 120 Potomac it was applied for and executed was it done purposely was the purpose to withhold possessions from their rightful owners. Do you understand what I am saying, was it in the course of your regular job and hope of fighting crime and possibly getting drugs and a drug dealer off the streets or where you there to remove peoples property to maintain it for yourself.

A. It was actually done to try and get drugs off the street.

Q. That's 120 Potomac I'm going to ask you specifically 521 Walden was that search warrant executed to remove property any kind of items what ever the case may have been with a preplan what might have been there and would have been taken and shared in accordance with some kind of pre planning.

A. We executed with the intent to get drugs off of the street. That's all.

Q. The same question for 395 W. Delavan in executing that search warrant was there pre planning what may have been in the house what was going be removed from the house and what was going to happen once it was removed.

A. No again the thing was to get as much drugs and guns off the street as possible.

Q. So the search warrants were basically done to do your job and at some point there came a situation or occurrence that things were removed incidental to the real purpose of the search warrant.

A. Correct.

Q. With no planning with the people executing the search warrant.

A. Correct

Q. Is there anything I haven't asked that you would like to add to this statement?

It's now 1805 hrs. 6:05PM I'm going to end this statement with one more question of Rene Gil.

Q. Were you coerced threatened promised anything to give this statement?

A. No.

Thank You I'm going to end this now.